UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Tatum Bass, a minor, by William K. Bass and Nina B. Bass, her parents and next friends,<br>    *Plaintiff*,<br><br>    *v.*<br><br>Miss Porter's School and Katherine Windsor,<br>    *Defendants.* | Civil No. 3:08cv1807 (JBA)<br><br><br>September 1, 2010 |

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Through her parents and next friends William K. Bass ("Mr. Bass") and Nina B. Bass ("Dr. Bass"), Plaintiff Tatum Bass ("Plaintiff" or "Tatum") brings suit against her former high school, Miss Porter's School ("Porter's"), and its Head of School, Katherine Windsor, alleging that for their decision to expel her and their conduct leading up to that decision, Defendants are liable for breach of express contract, breach of implied contract, negligent and intentional infliction of emotional distress, and breach of fiduciary duty. In addition to damages, Plaintiff seeks declaratory relief stating that Defendants are liable as claimed, and seeks injunctive relief requiring Defendants to issue her a high school diploma. Defendants have filed a motion for summary judgment on all claims, which, for the reasons that follow, will be granted in part and denied in part.

I.     Factual Background

Taken in the light most favorable to the nonmoving Plaintiff,[1] the record reveals the following.

---

[1] The Court will apply the familiar summary–judgment standard without recitation in detail. *See* Fed. R. Civ. P. 56(c)(2).

A.      Introduction

Tatum is an undergraduate student at Tulane University. She earned her high school diploma at Beaufort Academy in Beaufort, South Carolina, in 2009. Until the second semester of her senior year of high school, she had been a student at Porter's, a private girls–only high school in Farmington, Connecticut, but was expelled on November 19, 2008. This suit arises out of the events leading to her expulsion.

On July 1, 2008, Windsor became Head of School at Porter's, a position invested with substantial authority over the school's policies and practices. Porter's published at least three documents setting forth policies and practices: a Student Handbook (the "Handbook"), a Faculty Handbook (the "Faculty Manual"), and the School Curriculum Guide (the "Curriculum Guide"). Plaintiff relies on the Handbook for her claims.

B.      The Handbook

The Student Honor Code on the front cover of the Handbook states:

> As a student and member of the Miss Porter's School community, I promise to uphold the tradition of honesty and fairness that this community has taught since 1843. I will be truthful. I will be respectful of others, their property, and their opinions. I promise to foster these values in the community.

In her introductory welcome letter within the Handbook, Windsor states:

> It is important for all Porter's community members to have a clear concept of the structure, rules, policies, and procedures that allow everyone to learn and work together—in the halls, in the dorms, on the fields, and in the classrooms. The Student Handbook contains this key information. The pages that follow will reflect the values (trust, integrity, kindness, respect, safety, and health) that support our relationships and the rules to protect those values.

The Handbook contains a section called "Major School Rules."  This section states that Porter's "is a no–use campus" as to "alcoholic beverages or illegal or controlled drugs of any kind (including tobacco)," and provides that "[v]iolations of the drug, alcohol and tobacco rules will result in suspension and may be grounds for dismissal."  Also within the Major School Rules section, as to "Academic Integrity," the Handbook states that a student's "First Offense" includes the following consequences: parental notification; suspension; failing grade on assignment; potential obligation to redo the assignment; and

> If a college application asks specific questions about the suspension, it is the responsibility of the student to respond honestly.  If the School is asked directly about a student's disciplinary experience, the School will verify only that a suspension has occurred; requests for details will be referred to the student concerned.

Finally, as to Academic Integrity, the Handbook provides that "[t]he final decision concerning each situation lies with the Head of School."  Also within this section, the Handbook provides:

> Every student at Porter's is expected to behave in a responsible and kind manner that demonstrates personal integrity and respect for others. Inappropriate conduct within our school community is not tolerated. Unacceptable behavior includes but is not limited to:
> – bullying and intimidation . . .
> – disrespectful treatment of others, including words, gestures, and actions[.]

In a section titled "Discipline," the Handbook provides:

> If a student violates a rule, her behavior is reported to the Dean of Students for consideration.  If a major rule is broken, the Student Council, with a faculty representative, is called to recommend a disciplinary response based on evidence presented by the Dean of Students.  All recommendations from the Student Council are subject to the approval of the Head of School.  The Head of School reserves the right to dismiss a student from Miss Porter's School. . . .

The administration may at any time during the school year determine a disciplinary consequence without the aid of the Student Council.

The Handbook's Discipline section goes on to state:

Disciplinary Consequences – Major School Rules

Violation of a major school rule or repeated violation of other policies and procedures may result in a written contract, probation, in–house suspension, suspension or dismissal from school. . . .

– Contract: A document signed by the student that details the expectations that must be met in order for the student to continue at Porter's. . . .

Reports to Colleges

Many college applications, including the Common Application, ask students specific questions about disciplinary infractions.  If a student has been suspended from school for an infraction that occurred at any point in her time at Miss Porter's School, it is her responsibility to respond honestly to such questions.

The School is obligated to communicate accurate information to colleges regarding student applicants.  Disciplinary infractions that occur prior to the submission of secondary school report forms are considered internal matters, and the School will not comment on infractions unless specifically requested to do so.

The School will notify any institution to which the student has applied If the student is permanently withdrawn or dismissed from Porter's for any reason during her senior year.

In a section titled "Support Personnel, Procedures, & Services," the Handbook states:

Student Health

There may be times within the school year when a student's health must take precedence over her school responsibilities.  The School must intervene when a physical or emotional illness begins to either:

– impact directly on a student, rendering her incapable of meeting her commitments, or

– impact directly and detrimentally on others within the community.

In such cases, the School will place the student on a medical leave of absence in order to ensure that she receives specialized help.  Many times a medical

leave is misunderstood and perceived as a punishment, when in actuality it is a caring response and an attempt to help a student get well. . . .

When health concerns regarding a student are brought to the school's attention, the following takes place:

– A designated Miss Porter's School staff member receives, gathers, and validates information from other members of the community (i.e., house director, advisor, faculty, or others.)

– If intervention is determined to be necessary, appropriate staff members will have a discussion with the student; as well, a discussion with the student's parents will take place.

– A determination will be made as to whether the student can continue with her school requirements and commitments, or if she needs to be placed on a medical leave of absence.

– A request for a physical and/or emotional evaluation may take place to determine the level of wellness and safety of the student, as well as to ensure that her situation is not disruptive or potentially dangerous to others within the dormitory and/or the Porter's community.

Further action will be determined based on the results of the evaluation. Treatment can happen on campus or at home, depending on the severity of the illness and what best meets the needs of the student and the community. . . .

Procedure for Medical Leave of Absence

– A recommendation for a medical (physical or psychological) leave of absence is made by the Nursing Director or Director of Counseling to the Dean of Students (DOS).

– The DOS informs the parents of the conditions of the leave.

– The DOS informs the advisor, house director, and Academic Dean.

– The Academic Dean informs the student's teachers of the leave and assists the student in receiving the academic information she needs to keep up with her studies.

– The DOS writes to the parents (copies to student, advisor, house director, necessary teachers and administrators) outlining conditions of the leave. A follow–up phone call will confirm the understanding of all parties.

C.      Events Leading to Tatum's Expulsion

In her junior year, Tatum was elected to the position of Head of Student Activities, also known as Student Activities Coordinator ("SAC").  It was her responsibility in this position "to work with the director of student activities to provide and organize all the social activities of the school, whether . . . at the school or in cooperation with other schools," including Porter's's annual prom.  As SAC, Tatum was a member of the Heads of School, also known as the Nova Nine.  The Nova Nine are the Porter's students' "senior leadership forum" and meet weekly with the Dean of Students, who was Laura Jalinskas.  Tatum's advisor for her first three years at Porter's was Burch Ford, who was Head of School until retiring in July 2008, after which Windsor became Head of School.  Upon Ford's retirement, Tatum chose to have Porter's Associate Head of School Laura Danforth serve as her advisor for her senior year.  In her senior year, Tatum lived in Colony dorm, whose House Director was Kim Pourmaleki.

In a change from past practice, administrators from Porter's and other area private schools decided to hold a multi–school prom (the "Consortium Prom") during the 2008-2009 school year, and in May 2008 Porter's Associate Dean of Students Vera Polacek told Tatum of this decision.  At the beginning of her senior year, on September 19, 2008, Tatum heard a rumor from students at Avon Old Farms School ("Avon"), a nearby private boys–only high school, that Avon would not participate in the Consortium Prom.  Plaintiff met and discussed with Polacek how to deal with the rumor, and Tatum told Polacek that Avon's withdrawal would cause problems.  Porter's students began asking Plaintiff about the Consortium Prom and the rumored Avon withdrawal, to which Plaintiff responded by informing them that the Consortium Prom was the Porter's administration's choice.

6

Opinion among Porter's students was split as to the Consortium Prom; some favored it, while others opposed it.  On September 23, 2008, some students who approached Plaintiff were angry about the Consortium Prom, and Plaintiff told Polacek that the rumors had become a problem and needed to be addressed.  Plaintiff told Polacek that girls had been harassing her and that she could handle it for now, but that it would be wise for the administration to resolve the situation.  Tatum's friend A.A. told her that two girls referred to Plaintiff as a "retard"; after Tatum discussed the matter with Windsor and Danforth on September 25th, those two girls denied (to Porter's Academic Dean Plough and Danforth) that they had done so, and then they both apologized to Plaintiff.

Although Plaintiff never used the words "bully" or "harass," she reported in a September 25th meeting with Windsor and Danforth, during which she was distraught, that some girls had been disrespectful to her.  Tatum began crying during the meeting when she reported that girls had been making fun of her for her attention deficit disorder ("ADD").  According to Tatum, Windsor and Danforth told her that "girls will be girls" and that she should "ignore it and let it roll off [her] back."  At the end of the meeting the two women hugged Tatum and told her to come back if she needed anything more from them.

The next morning, September 26th, Dr. Bass met with Windsor and Danforth to discuss the prom and other issues.  Dr. Bass had learned from Pourmaleki on September 23d about the incidents with Tatum earlier that day; on September 25th Pourmaleki reported to Dr. Bass that she had attempted to report the September 23d incident to Danforth, Polacek, or Jalinskas.  Later on September 25th Dr. Bass, who was in Farmington, picked up Tatum and brought Tatum to her hotel room, whereupon Tatum began crying.  Dr. Bass went the next morning to see Windsor, and she spoke with Danforth and Windsor about the retard

7

name–calling incident and public disclosure of Tatum's ADD.  Dr. Bass called the parents of at least one of the girls who had called Tatum a retard.  Later on September 26th, Plaintiff participated in a skit parodying Porter's administrators; Plaintiff portrayed Ford and her performance was well received.

On September 30th, while Tatum studied in a common area of Colony Dorm, a number of students approached her about the Consortium Prom.  Some voiced support, but many were opposed, and Tatum "felt attacked and blamed for organizing the prom."  On October 1st Tatum communicated to Polacek, Pourmaleki, and Windsor that the girls opposed to the Consortium Prom had been "extremely rude, inconsiderate and unappreciative" of her work for them.  She also e–mailed Polacek separately, stating that she "really need[s] some support" because "[a]ll of the girls are complaining and freaking out" about Avon's rumored withdrawal even though she is "doing as much as [she] can as a student."  In an e–mail dated October 2d Tatum's friend expressed concern to Tatum that "anti–Tatum sentiment" could "explode[]" on campus.[2]  Pourmaleki believed the issues were "just . . . teenage stuff" and that most girls were in favor of Tatum's plans and wanted to hang out with her.  On October 2d Dr. Bass reported to Danforth that Tatum continued to feel pressure over the prom; Danforth stated she would get involved and address the issue with the senior class, and Dr. Bass expressed appreciation for Danforth's promise.  Danforth and Windsor met with the senior class on October 3d, and Danforth told the students that the administration, not Tatum, had decided to hold the Consortium Prom; that the

---

[2] Defendants assert that all the e–mails to Tatum were complimentary.  Many e–mails were complimentary—and Defendants proffer these e–mails—but this does not establish that no one was rude or inconsiderate toward her.

mean–spiritedness was mean and unnecessary; and that remaining issues should be raised with Polacek or another adult.  Plaintiff believed at that meeting that things would get better thereafter.

Danforth also required the junior and senior classes to hold a vote regarding the Consortium Prom.  The Nova Nine supervised this vote a week later, on October 10th; a majority favored the Consortium Prom.  At least one senior, H.S., began circulating a petition for a re–vote with seniors' votes counted twice as heavily as juniors' votes; but she eventually abandoned plans to petition for a re–vote.  Tatum learned of this petition on October 16th, and it confirmed for her that some girls were still opposed to the Consortium Prom.

On October 9th, the day before the vote, Tatum withdrew from her sports class to avoid additional confrontation with other girls regarding the Consortium Prom.  Dr. Bass told Danforth about Tatum's distress.  After the vote, on October 13th, Tatum went to the Student Health Center because she was having difficulty sleeping; she told the nurse on duty that she was having difficulty sleeping in her dorm, had problems with girls, and was stressed out and anxious.  No record exists of Tatum's October 13th visit despite then–Director of Counseling Katherine Barron's testimony that it is common for girls to sleep in the infirmary.

Also in September 2008, a rumor arose that Tatum had misallocated some of the senior class's funds.  Nova Nine member and Student Head of School A.T. investigated, located bank records, established that Tatum had not misallocated any money, and announced the results of her investigation to the senior class.

On October 23d, Tatum sought out Danforth's support. She and Danforth cooked dinner together that night, and Tatum began crying as she spoke with Danforth, and expressed her nervousness about an upcoming AP Art History test. Tatum planned to meet with Danforth again the next day. In an October 24th e–mail exchange, Tatum sought to make an appointment to meet with Danforth, who said she would be available in the afternoon. Danforth also advised Tatum to stop talking about her AP Art History grades with AP Art History teacher Sarah Quinn since "a B+ is right where [she] should be," and advised Tatum "to let this go" because she would otherwise risk "get[ting] caught up in being disrespectful." Quinn and Danforth expressed concern about Tatum's too–deep interest in her art history grade. Danforth was too busy to meet with Tatum later on the 24th.

On October 27, 2008, Plaintiff had to take the AP Art History test. She had created type–written notes to study for the test. The first half of the test was related to visual slides, and for the second half Tatum had to go to a different room. (Her ADD entitled her to extra time to complete the exam.) In moving from one room to the other, Tatum accessed her notes and brought them into the second room, where she used them to cheat on the second half of the test. Quinn came in and saw Tatum's notes but did not discuss the matter with Tatum. Immediately after the test concluded, Tatum, shocked at her own behavior, went directly to Porter's's administrative officers to admit what she had done. All the administrators she saw were busy, and while she waited for any of them to meet with her, Quinn approached the same offices. Plough came out of her office just as Quinn arrived. Quinn asked Tatum to report what she had done, and Tatum admitted to Plough that she had cheated. Plough told Plaintiff that the cheating was a violation of the academic integrity policy and carried an automatic three–day suspension. Porter's Director of Studies Rachel

Countryman and Porter's Director of College Counseling Liz Schmitt, and then Windsor, came to Plough's office. Plough called Dr. Bass to inform her of Plaintiff's having cheated. Plough informed Dr. Bass that she would issue Tatum a 59, rather than a zero, on the test. Pourmaleki arrived and put her arm around Tatum.

Defendants assert that the three–day suspension is always, as a matter of policy, served off–campus; the Student Handbook provides that suspension is only one of a number of possible disciplinary measures for violation of a major rule (such as academic integrity), and that suspension may be "in–school" or off–campus. Under Porter's policy, Tatum also had to relinquish her SAC and Nova Nine positions. It was too late in the day to make travel arrangements for Tatum to leave Farmington, so Tatum stayed in Pourmaleki's personal residence. Pourmaleki informed Dr. Bass of the plan. Dr. Bass discussed with Windsor the idea of Tatum's withdrawing from Porter's to avoid acknowledging what had happened; Windsor suggested that would not be a good idea.

Tatum had submitted her college application to Vanderbilt University—her top choice for college—just a few days before the cheating incident, and had reported on her application that she had not been subject to academic discipline. Porter's personnel offered assistance to Plaintiff in reporting her misconduct to the universities to which she had applied, including a letter of support from Quinn.

After spending the night at Pourmaleki's residence, Tatum flew to Nashville, Tennessee rather than back to South Carolina, because she wanted to go directly to Vanderbilt. She had attended a summer program at Vanderbilt the previous summer (Summer 2008) and had obtained letters of recommendation for college admission from two Vanderbilt professors. In light of her cheating and suspension, Tatum wanted to inform

11

these professors personally and give them the opportunity to withdraw their support of her college applications. Dr. Bass discussed Tatum's plans at Vanderbilt with Ford and Schmitt, and asked Schmitt to make an appointment for the Basses at Vanderbilt's admissions office. Dr. Bass denies that she ever gave Schmitt permission to disclose the reason for the Basses' desired appointments. Late on October 27th, Schmitt e–mailed Vanderbilt admissions office staff member Ken Shows; on the morning of October 28th she e–mailed another Vanderbilt admissions office staff member, John Gaines. In those e–mails Schmitt disclosed that Tatum had cheated on a test and wanted to discuss it personally with the admissions office. Plaintiff e–mailed Schmitt to thank her for helping her. Vanderbilt denied Tatum's application; Gaines avers that Tatum's cheating incident was immaterial to the committee's consideration of her application, and that she was denied admission because her academic credentials were not strong enough.

Tatum's three–day suspension ended on October 30th; she was expected back in class on October 31st, but she did not return to class until November 6th. In the meantime, on October 28th, and notwithstanding that Porter's's School Curriculum Guide requires seniors to attend courses on Porter's's campus to graduate, Mr. Bass contacted Schmitt to see if she could help arrange for Tatum to enroll at High Mountain Institute ("HMI"), a private school in Colorado, or the Masters School, a private school in Dobbs Ferry, New York, for her last semester of high school. Schmitt inquired with HMI and Windsor inquired with the Masters School, but neither could obtain placement for Tatum at either institution. On November 3d, Windsor met with the Basses regarding Tatum's return to Porter's. The Basses wanted Porter's to switch Tatum to day–student status or permit Tatum to complete her studies "in an alternative setting." Mr. Bass and Windsor thereafter exchanged a series of increasingly

hostile e–mails and phone calls.  At 1:30 p.m. on November 4th, Windsor sent the Basses a letter summarizing their November 3d meeting and rejecting the request to have Tatum complete her studies elsewhere but offering to change Tatum to day–student status; to change her advisor from Danforth to Chris Hampton; to set up meetings and supervision to assist Tatum transition back to being in classes; to permit Tatum to step down rather than be dismissed from her SAC position; and to have Schmitt reach out to the colleges to which Tatum applied to characterize the cheating incident as "out of character."  Two hours later, at 3:30 p.m., Mr. Bass wrote to Windsor to address the issues raised in Windsor's letter.  Mr. Bass asked for greater communication between Porter's personnel and Mr. and Dr. Bass; requested a meeting with the Basses, Tatum, and Windsor; rejected the offer to have Tatum step down from her Nova Nine position; and reiterated their request for "Second Semester alternatives to on campus attendance."  After reading Windsor's letter, Mr. Bass wrote to Windsor again, at 7:30 p.m. that evening, reiterating much of what he had written at 3:30 p.m.

Just after midnight, Windsor e–mailed back to Mr. Bass to reject Mr. Bass's request to change the tuition payments to reflect Tatum's day–student status; to state that all communication go through her; to disagree that Porter's administrators had been unresponsive to Tatum's troubles; to confirm that only Tatum will inform the colleges of the suspension; and otherwise to reject Mr. Bass's requests or to reiterate what she had previously written.

On November 5th, Mr. Bass wrote to Windsor to inform her that Tatum would return to classes the next day, November 6th.  On the 5th, Danforth set up a schedule for the Basses to meet with many Porter's personnel on the 6th.  On November 6th, Alyce Alfano,

who by then had become the Basses' attorney, wrote to Windsor to ask for "a complete copy of Tatum's educational records." On November 10th, Windsor wrote to Mr. Bass to "check in" regarding Tatum's transition to day–student status. At some point on the 10th, the Basses' new attorney, Karen Stansbury, sent Porter's a 25–item list of "Plaintiffs' Demands for Settlement," including Porter's's authorization of "an independent study curriculum for Tatum" that would be "[r]etroactive to Monday, October 27, 2008," as well as that "[Porter's] will close Tatum's school email account." Porter's disabled Tatum's access to her Porter's e–mail account, perhaps on November 11th but certainly by November 12th. On November 11th, Windsor informed some Porter's personnel that the Basses "have begun legal action against the school," and Windsor then required all communication with the Basses to go through her. The same day, Dr. Bass wrote to Porter's Nursing Director Diane Foley to advise her that "she was placing Tatum on extended medical leave as of that date."[3] Foley

---

[3] Plaintiff and Defendants have each moved to seal certain exhibits in the record. (Defs.' Mot. Seal [Doc. # 146]; Pl.'s Mot. Seal [Doc. # 159].) The parties have each submitted the exhibits sought to be sealed in two forms: sealed but unredacted; and unsealed but redacted. (*See* Sealed but Unredacted [Doc. ## 149, 163]; Unsealed but Redacted [Doc. ## 145, 160].) Defendants seek to seal information in order to avoid disclosing information deemed individually identifiable health care information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and Plaintiff seeks to seal information required to be sealed under Local Rule 5(e)8. Earlier in this case the Court had occasion to warn the parties of the requirement that they narrowly tailor any requested sealing to protect the interest in providing access to all information relevant to the performance of the judicial function. (*See* Order on Motions to Seal [Doc. # 120].) The parties' motions to seal portions of exhibits in the summary–judgment record, which are unopposed, will be granted because the sealings are supported by compelling reasons, and in light of the parties' proffers of unsealed, redacted versions of the sealed exhibits—as well as unredacted summaries of relevant sealed exhibits in the parties' Local Rule 56(a) Statements—the unsealed record in this case, to which the public has access, provides the complete factual basis for the Court's performance of the judicial function. The Court's ruling on the motion for summary judgment does not require discussion of any fact absent

avers that Tatum was never placed on medical leave.  On November 11th Mr. and Dr. Bass accompanied Tatum to her room in Colony Dorm to collect some of her things; Tatum's roommate C.W. had placed a "For Rent" sign on Tatum's bed.  Although Defendants characterize this as a mere joke, Tatum was distressed and upset by it.

The next day, November 12th, Jeffrey Mirman, Porter's's counsel, rejected the Basses' demands, rejected as improper Dr. Bass's stated intent to unilaterally place Tatum on a medical leave of absence, and proposed a counteroffer under which Tatum would continue attending classes and would earn an Porter's diploma the following Spring; the Basses would be obligated to continue paying tuition to Porter's whether or not Tatum continued classes there; and that "Tatum [would] be required to honor the contract she signed and the [Porter's] Code of Conduct."  Also on November 12th, Tatum's pediatrician in Georgia, Stephen H. Smith, called Foley, who explained to Smith that "in order to consider placing Tatum on a medical leave, Porter's required a letter making such a request from a qualified medical health professional" as well as "a medical and psychiatric evaluation, including full access to both physicians."  Smith faxed a letter to Porter's recommending Tatum's "absence from [Porter's] for medical reasons" but not including any report of any medical or psychiatric evaluation by Smith.  In the meantime, the tone of communication between Mirman and Stansbury devolved, and on November 12th Mirman wrote Stansbury a letter stating that Dr. Bass's "merely . . . informing the School that the student has been placed on [medical leave] status" does not accomplish a bona fide "[m]edical leave of absence."

The next day, November 13th, Mirman again wrote to Stansbury, this time to request additional information before Porter's could "begin the review necessary to place Tatum on

───────────────

from the unsealed record.

medical leave," including "[a] report from a physician who has examined and evaluated Tatum." In the meantime, Mirman stated, Tatum's absence from Porter's was unexcused. On Saturday, November 15th, Yale Child Study Center Assistant Clinical Professor C. Preston Wiles wrote a letter to the Basses stating that he evaluated Tatum and recommended that "she be placed on medical leave from [Porter's]"; Dr. Bass hand–delivered the letter to Foley the same day. Foley then forwarded the letter to Windsor and Jalinskas and informed them that she told Dr. Bass that she (Foley) does not have authority to approve a medical leave, and that instead Porter's staff physician Leonard Forner and Porter's staff psychiatrist Alicia Carmona would have to speak with Wiles and then make a recommendation to the Dean of Students "concerning the medical leave." She said she would ask Forner to speak with Wiles on Monday, November 17th.

On November 17th, Danforth wrote a report to Jalinskas that stated the following facts. On November 12th, Danforth and Jalinskas apparently spoke to the senior class regarding Tatum's stepping down from the Nova Nine. After their presentation, a student, H.S., came to Danforth to ask if Tatum had to step down for violating the alcohol policy. During this conversation H.S. told Danforth that in late September "Tatum Bass was very drunk, throwing up and needing assistance. [Two students] got Tatum upstairs to her dorm room and apparently stayed with her through most of the evening. [H.S.] reported that Tatum threw up several times due to alcohol consumption. [¶] Several days following the senior class meeting, several students were under the impression that Tatum was disciplined for the particular evening for alcohol consumption and were upset with the school that she did not go through regular disciplinary action." Tatum admits the substantive facts of her drunkenness and vomiting in late September 2008.

16

On November 18th, Windsor wrote to the Basses to inform them that she had expelled Tatum:

> Since Tatum's return to School following her suspension for academic dishonesty, she has missed many classes, and her absences have been unexcused. As I have informed you repeatedly, you have, in significant ways, failed to follow School policy and have not presented us with an acceptable plan for Tatum to return to School. Furthermore, you have made it clear to me that neither you nor Tatum is any longer able or willing to fulfill the expectations of the School community.
>
> Although these reasons alone justify Tatum's dismissal from School, I have learned recently that Tatum violated the School policy regarding alcohol use on September 27, 2008. Her two major school violations, standing alone, compel this result.

Windsor offered to permit Tatum to withdraw rather than be expelled, conditioned on the Basses' executing a release. The Basses asked for and obtained a one–day extension in which to consider Windsor's offer, but they then refused, and Windsor informed them on November 19, 2008 that Tatum had been expelled.

At her deposition, Windsor testified that she decided to expel Tatum because it became clear that the Basses were not going to work with her to find "an acceptable solution for" Tatum; that "[i]n the meantime" Windsor learned of Tatum's "drinking incident which broke major, multiple major school rules" that would have to be processed; that the Basses kept informing her of inconsistent intentions; and that the relationship between Porter's and the Basses had broken down.

Plaintiff filed suit seven days later, on November 26, 2008.

II.     Standard

"Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the

17

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.    Discussion

    A.    Educational Malpractice

    In *Gupta v. New Britain General Hospital*, 239 Conn. 574 (1996), the Connecticut Supreme Court held that educational–malpractice claims, whether sounding in tort or contract, are not permitted under state law.  *Gupta* set forth two exceptions to this rule, each of which are based on the premise that "an educational institution does not have license to act arbitrarily, capriciously, or in bad faith."  The first exception is for any "substantial departure from academic norms," which "may implicate due process."[4]  The second is for "breach of an educational contract by a private institution."  *Gupta*, 239 Conn. at 595.  As to the second exception, *Gupta* forecloses a breach-of-contract claim where the claim is of a "fail[ure] to provide an effective manner or course of instruction," but does not foreclose a claim for "a breach of a specific, identifiable promise."  *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 96 (D. Conn. 2000); *see also Faigel v. Fairfield Univ.*, 75 Conn. App. 37, 38 (2003) ("To

---

    [4] In *Doe v. Yale University*, 252 Conn. 641 (2000), the Connecticut Supreme Court clarified that to determine whether a *negligence* claim states a valid claim or an unpermitted educational–malpractice claim, the court should inquire into the nature of the duty asserted. *Doe*, 252 Conn. at 658–60, 663 (holding that *Gupta* did not foreclose claim that university negligently failed to train and supervise plaintiff who was exposed to HIV); *see also Johnson v. Schmitz*, 119 F. Supp. 2d 90, 94–95 (D. Conn. 2000).

limit judicial intrusion into educational decision making, the student must . . . allege nonperformance of a special promise, a promise outside the purview of normal educational expectations").[5]

      B.      Counts 1–7: Breach of Express and Implied Contracts

The Connecticut Appellate Court has recently observed that

> [t]he basic legal relation between a student and a private university or college is contractual in nature. There seems to be no dissent from the proposition that the catalogues, bulletins, circulars, and regulations of the institution determine the contractual relationship between the student and the educational institution. . . . Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises, consistent with the limitations expressed in *Gupta* . . . appears sound.

*Burns v. Quinnipiac Univ.*, 120 Conn. App. 311, 320–21 (2010) (quoting *Johnson*, 119 F. Supp. 2d at 93); internal quotations omitted; alterations in *Burns* and *Johnson* omitted). Although Defendants argue that *Gupta* precludes Plaintiff's contract claims, they do not challenge application of the legal proposition that the "basic legal relation" between Tatum and Porter's "is contractual in nature," notwithstanding that Porter's is a secondary school, not "a private university or college," Plaintiff was a minor when she enrolled at Porter's, and there is no evidence in the record that she, rather than her parents, "deci[ded] to attend"

---

[5] In *Faigel* the Connecticut Appellate Court held that an alleged oral promise by a university to give the plaintiff "'"many credits" from her prior engineering studies'" does not "qualif[y] as a 'specific contractual promise'" and therefore fell short of *Gupta*'s "requirement that a claim of breach of contract by an educational institution . . . be based on the breach of a 'specific contractual promise.'" *Faigel*, 75 Conn. App. at 42 (" How many is many? None of the plaintiff's allegations of fact sheds any light on the answer to this question.").

Porter's.  Therefore, and consistent with the parties, the Court will assume *arguendo* without

deciding that this proposition of law applies to this case.

> Among "the general principles governing the construction of contracts" are that
>
> a contract must be construed to effectuate the intent of the parties, which is
> determined from the language used interpreted in the light of the situation
> of the parties and the circumstances connected with the transaction.  If a
> contract is unambiguous within its four corners, the determination of what
> the parties intended by their contractual commitments is a question of law.
> When the language of a contract is ambiguous, however[,] the determination
> of the parties' intent is a question of fact.

*Remillard v. Remillard*, 297 Conn. 345, 2010 WL 2612630, *4 (July 13, 2010) (internal

alterations and quotations omitted).[6]

### 1.    Count 1: Informing Vanderbilt of Tatum's Cheating

Plaintiff's first claim is that when Schmitt e-mailed Vanderbilt admissions officers

Gaines and Shows and informed them that Tatum had cheated on the AP Art History test,

Porter's breached the "First Offense" provision of the "Academic Integrity" section of the

Handbook's "Major School Rules" chapter.  That provision specifies that "[i]f [Porter's] is

asked directly about a student's disciplinary experience, [Porter's] will verify only that a

suspension has occurred; requests for details will be referred to the student concerned."

By its terms this provision governs only those circumstances in which a college has

requested disciplinary-experience information from Porter's, which was undisputedly not

what happened in this case.  To the extent that the Handbook's Academic Integrity section

---

[6] Plaintiff argues that the question of the existence and scope of a contract is a question of fact for a jury.  *Remillard* makes clear, however, that such questions are improperly resolved on summary judgment only where the contract is ambiguous, because where a contract is unambiguous, the parties' intent is to be gleaned only from the contract itself, and its meaning and scope are questions of law.

includes any "specific, identifiable promise" by Porter's not to disclose a student's disciplinary record, that promise applies only to Porter's's response to a request for such information.  That promise is inapplicable to Schmitt's e–mails to Gaines and Shows because Schmitt's e–mails were not prompted by any request by them or Vanderbilt for any information, and therefore even assuming *arguendo* that the Handbook language on which Plaintiff relies shows a "specific, identifiable promise," the record does not show that promise to be applicable here.

However, as Plaintiff points out, a different section of the Handbook notes that it is a student's "responsibility" to respond honestly to college applications' queries "about disciplinary infractions," and that section, captioned "Reports to Colleges" and falling within the "Discipline" chapter of the Handbook, goes on to state that "[d]isciplinary infractions that occur prior to the submission of secondary school report forms are considered internal matters, and [Porter's] will not comment on infractions unless specifically requested to do so."  Defendants argue that this provision is not an enforceable contractual promise because the Discipline chapter of the Handbook "reserve[s] final discretion on such matters to the Head of School."  (Defs.' Reply Supp. at 7.)  The "Academic Integrity" section of the Handbook does reserve final discretion to the Head of School, as Defendants assert, but the "Discipline" section provides that "[t]he administration"—not the Head of School—"may at any time during the school year determine a disciplinary consequence without the aid of the Student Council."

In this case, a reasonable finder of fact could conclude that by emailing Gaines and Shows, Schmitt—and through her Defendant Porter's—breached a contractual obligation contained in the Handbook.  Taken in the light most favorable to Plaintiff, the record shows

that Schmitt "comment[ed] on [an] infraction[]" by Tatum without having been "specifically requested to do so."  (In addition, the e–mails were sent by Schmitt, not the Head of School, and the record shows that Schmitt sent the e–mails in what she believed to be an attempt to *assist* Tatum, not *discipline* her.)  Although the record does not define "[t]he administration" of Porter's, a reasonable jury could conclude that Schmitt belonged to Porter's's administration: she was the Director of College Counseling for Porter's; she and her phone number are listed on the first page of the Handbook above those for the Dean of Students and Director of Admissions; and the Porter's Faculty Handbook lists the Director of College Counseling as a member of Porter's's "Administrative Team."  In addition, while the record is silent on whether Tatum's cheating on the test "occur[red] prior to the submission of secondary school report forms," in light of the fact that Tatum cheated on October 27th—five days before her early–admission application to Vanderbilt was due (although after she actually submitted the application)—a reasonable finder of fact could conclude that she cheated on the test before Porter's submitted any "secondary school report forms" to Vanderbilt.  Together, these reasonable inferences and findings would support a conclusion that by e–mailing Gaines and Shows and telling them that Tatum cheated on her AP Art History test, Schmitt, and through her Defendant Porter's, breached its specific, identifiable promise not to disclose disciplinary infractions occurring prior to submission of secondary school reports.

Therefore, Defendants are not entitled to summary judgment on Count 1.

2.    Count 2: Dismissing Plaintiff Without a Hearing

Relying on the first paragraph of the "Discipline" section of the Handbook, Plaintiff asserts that when Windsor expelled Tatum without "offer[ing] Tatum a reasonable

22

opportunity to present matters in her defense or in mitigation of her conduct in connection with the decision to expel her" (Pl.'s Opp'n at 19), Porter's breached the Handbook, which provides that when a student breaks a major rule, "the Student Council, with a faculty representative, is called to recommend a disciplinary response based on evidence presented by the Dean of Students." Plaintiff's claim must be dismissed. First, this provision of the Handbook is silent as to any opportunity any *student* would have to present evidence, and in fact contemplates presentation of evidence only by the Dean of Students. The fact that Tatum was not given an opportunity "to present matters in her defense" does not suggest or show any breach of this provision. Moreover, as noted above, the Handbook's Discipline section provides that "[t]he administration *may at any time* during the school year determine a disciplinary consequence *without the aid of the Student Council*," which clearly vests Porter's's "administration" with discretion both to determine penalty, and also to do so without going through the Student Council hearing during which Plaintiff incorrectly claims she was entitled to present evidence. In addition, the introduction to the Handbook's Discipline section—before distinguishing consequences for violations of "major" and "other" school rules—states that "[t]he Head of School reserves the right to dismiss a student from Miss Porter's School," a provision that clearly and expressly granted Windsor the authority and discretion to dismiss Tatum regardless of whether the Student Council is asked to recommend a disciplinary response or, if it is, the factual basis on which such recommendation might be made, or what the recommendation is.

Plaintiff had no contractual right to present anything to the administration or Student Council as the administration considered what discipline to impose on her.

Therefore, Defendants are entitled to summary judgment on any breach–of–contract claim based on her inability to present such matters.

### 3.    Count 3: Failure to Prevent Bullying and Harassment

Plaintiff next complains that Porter's's failure to enforce the Handbook's prohibition on "bullying and intimidation" or other "[i]nappropriate conduct" constitutes a breach of the Handbook. This claim must also be rejected. Even assuming that Tatum was subjected to bullying, intimidation, or inappropriate conduct, and further assuming that Porter's personnel were aware of it, the Handbook contains no "specific, identifiable promise" by Porter's to enforce the Handbook, and the language on which Plaintiff relies could be construed, at best, only as a promise *by Porter's students* to behave appropriately. Plaintiff is also incorrect to draw, from the fact that these behavioral injunctions are found in the "Major School Rules" section of the Handbook, the conclusion that Porter's is contractually obligated to penalize every violation of every Major School Rule (and thus to enforce the Handbook), because the Handbook provides that the Dean of Students must first "consider[]" whether to proceed with any discipline at all, that the Head of School must then approve any recommended discipline, and that in any event "[t]he administration" is vested with final discretion to "determine a disciplinary consequence," if any, for breach of any school rule. The Handbook imposes no requirements or limitations on exercise of this discretion by the Dean of Students or Head of School, or criteria by which such discretion could be judged. The Handbook thus contains no "specific, identifiable promise" by Porter's that it will impose discipline for *every* major school rule violation or that it will otherwise enforce the Handbook. Because Count 3 incorrectly assumes the contrary, Defendants are entitled to summary judgment on this count.

4.      Count 4: Failure to Intervene for Plaintiff's Distress

Plaintiff next asserts that Porter's breached the section of the Handbook that provides that Porter's "must intervene when a physical or emotional illness begins to . . . impact directly on a student, rendering her incapable of meeting her commitments," and specifies that "[i]n such cases, [Porter's] will place the student on a medical leave of absence." Although this Handbook provision is phrased in the imperative—Porter's *must* intervene and *will* require a medical leave of absence—it contains no criteria by which to determine when a student is sufficiently "emotional[ly] ill[]" to warrant the intervention thereafter described.  In the paragraphs following the imperative phrasing, the Handbook sets forth the process by which a determination of when an "illness begins to . . . impact directly on a student," and Handbook imposes no *obligation* on Porter's during that process other than to designate a staff member to investigate a student's health "[w]hen health concerns regarding a student are brought to the school's attention," because the Handbook calls for no further action unless Porter's personnel determine it to be "necessary," vests Porter's personnel with the discretion to determine when "intervention is determined to be necessary," and contains no cabin on exercise of that discretion.  The Handbook does not even specify the "members of the community" whose "information" the "designated [Porter's] staff member" must "receive[], gather[], and validate[]," let alone how he or she must do so.  Because Porter's has no contractual obligation under the Handbook to do anything other than designate a staff member who may determine from whom to obtain information from members of the Porter's community, Plaintiff has not shown a "specific, identifiable promise" by Porter's that Porter's has breached.  Therefore, Defendants are entitled to summary judgment on Count 4.

25

5. Count 6: Failure to Consider Placing Plaintiff on Medical Leave

The last provision of the Handbook on which Plaintiff relies is contained in the section titled "Procedure for Medical Leave of Absence," which states that that procedure involves *first*, a recommendation by the Nursing Director or Director of Counseling to the Dean of Students that a student be placed on a medical leave of absence; *second*, the Dean of Students informing the student's parents, advisor, house director, and Academic Dean of the conditions of the leave; *third*, the Academic Dean informing the student's teachers and arranging to ensure that the student can "keep up with her studies"; and *fourth*, the Dean of Students "writ[ing] to the parents . . . outlining conditions of the leave." The Handbook then addresses the conditions upon which a student may return from a medical leave of absence: the student's "treating physician" first contacts Porter's's "health professional," who informs the Dean of Students "of the student's requested return date and follow–up treatment," after which the Dean of Students, Head of School, and Associate Head of School together "make the final decision regarding the conditions of the student's return to school."

Plaintiff complains that Porter's ignored a request by Dr. Bass that Tatum be placed on a medical leave of absence, and also declined to take into consideration the opinions of Tatum's physician Smith and the Yale clinical professor Wiles in determining whether to place Tatum on a medical leave of absence. This breach–of–contract claim cannot stand because the provisions of the Handbook on which Plaintiff relies—which contemplate Porter's's consideration of a student's physician's recommendations—do not apply unless and until Porter's has already determined, in its discretion, that a student be placed on a medical leave of absence. Moreover, the Handbook, which requires an Porter's staff member's recommendation before any medical leave of absence may be authorized, does not

contemplate the scenario at issue in this case, in which a student (or her family) initiates a request for a medical leave of absence. Simply stated, whether or not Porter's personnel acted *unfairly* in declining to agree to Dr. Bass's request (or Smith's or Wiles's recommendations) that Tatum be given a medical leave of absence, Defendants made no "specific, identifiable promise" to consider such a request—whether or not supported by medical documentation—and therefore no breach–of–contract claim may lie for their failure to do so.

Plaintiff also relies on the November 13, 2008 letter from Jeffrey Mirman to Karen Stansbury, which requests information before Porter's could begin a medical leave review, in support of the argument that Porter's had a contractual obligation to consider Dr. Bass's request for medical leave. However, as with the provisions of the Handbook, this letter does not constitute a "specific, identifiable promise" to consider Dr. Bass's medical leave request, but rather identifies those items required for Porter's discretionary determination of any medical leave. Therefore, Defendants are entitled to summary judgment on Count 6.

### 6.   Count 5: Breach of Implied Agreement

"An implied contract 'depends on actual agreement, and the party charged must have agreed, either by words or action or conduct, to undertake a contractual commitment to the party seeking to enforce such a commitment.' Like an express contract, an implied contract 'requires a "meeting of the minds" between the parties.'" *Plainville Elec. Prods. Co., Inc. v. Bechtel Bettis, Inc.*, No. 3:06cv920(SRU), 2009 WL 801639, *12 (D. Conn. Mar. 26, 2009).

The implied promise Plaintiff alleges Porter's to have made is "too imprecise to qualify for consideration as a 'specific contractual promise.'" *Faigel*, 75 Conn. App. at 43 (quoting *Doe v. Yale Univ.*, 252 Conn. 641, 659 (2000)). Plaintiff's argument is that "[i]f the

Court finds that no express contract existed between the parties, then the relationship must be governed by an implied contract," that "[t]he implied contract is based on the promises contained in the Student Handbook, and Defendants' *in loco parentis* status," and that "[i]t is unfathomable that a parent would pay for his or her minor child to attend a boarding school far away from home without an implied understanding that the school and its faculty will care for the child's physical and emotional needs while the child is in the school's custody and control." (Pl.'s Opp'n at 30.)

Plaintiff's argument is unavailing for four reasons. First, Plaintiff provides no legal basis for its assumption that if the Court concludes no express contract exists, there *must* be an enforceable implied contract between the parents and the school. There is no legal requirement that every aspect of Porter's's behavior toward Plaintiff be governed by contractual obligation. Indeed, there is a fundamental inconsistency to Plaintiff's argument that even if the language of the Handbook is non–promissory language giving rise to no *express* contractual obligations, that same non–promissory language must then give rise to *implied* contractual obligations.

Second, neither the parties' briefing nor the Court's research reveals any authority for the proposition that either Porter's—the only Defendant against which Count 5 is brought—or its staff members serve *in loco parentis* to Porter's students. Connecticut's *in loco parentis* statute applies only to public schools. *See* Conn. Gen. Stat. § 10-220(a) ("Each local or regional board of education shall maintain good public elementary and secondary schools . . . [and] shall provide an appropriate learning environment for its students"); *see generally id.* §§ 10-220 & 10-221; *Burbank v. Canton Bd. of Educ.*, No. CV094043192S, 2009 WL 3366272, *10 (Conn. Super. Ct. Sept. 14, 2009) ("If parents choose to enroll their

children *in the public schools*, however, they permit school officials to act in loco parentis for many purposes, 'with the power and indeed the duty to inculcate the habits and manners of civility.'" (citations omitted, emphasis added)).

Third, Plaintiff's argument overlooks the difference between a parent's "implied understanding" and an "implied contract" between the parent and the school sufficiently specific to give rise to a cognizable cause of action that survives *Gupta*. Although Plaintiff's parents may have understood otherwise, neither Plaintiff's argument nor the record evidence reflects any meeting of the minds between the Basses and Porter's that Porter's would care for Tatum's "physical and emotional needs" in any particular or specific way. Even if the evidence could show such an agreement, Plaintiff asserts nothing more than a general agreement to care for her, which is not a "specific, identifiable promise" the evidence shows Porter's to have broken.

Finally, Plaintiff argues that the evidence shows that Porter's's breach of the implied agreement occurred when Porter's "fail[ed] to care for Tatum's physical and emotional health while having custody and control over her" after being informed that Tatum was subjected to bullying. (Pl.'s Opp'n at 29–30, 31.) Plaintiff does not explain how her parents' having informed Porter's personnel that she was subjected to bullying forms the basis of a "meeting of the minds" *predating that bullying* regarding what, specifically, Porter's personnel would do to care for Plaintiff in the event of such bullying. Under *Faigel* and *Gupta*, this imprecision is fatal to Plaintiff's implied–contract claim against Porter's.

For these reasons, Defendants are entitled to summary judgment on Count 5.

C.      Tort Claims

1.      Count 7: Negligent Infliction of Emotional Distress ("NIED")

Defendants argue that the NIED claim "is really just a cleverly disguised claim for educational malpractice," and that because the claim is "that [Porter's] administrators negligently exercised their professional judgment in connection with their interpretation and enforcement of the School's academic, administrative and disciplinary policies[,] [p]ursuant to *Gupta*, such a negligence claim is not recognized."  (Defs.' Mem. Supp. at 28.)[7]

Plaintiff responds that unlike the claims in the cases Defendants cite, her claims "are based on actions taken by Defendants in violation of [Porter's's] own rules, regulations, policies and procedures," including Defendants' failure to process Plaintiff's request for a medical leave of absence; disabling her e–mail access, blocking communication between Plaintiff and her family, Porter's administrators, and teachers; and "expell[ing] her from school when they knew she was suffering from severe emotional distress."  (Pl.'s Opp'n at

---

[7] Other courts that have addressed NIED claims against educational institutions have dismissed them where they have "implicate[d] the exercise of professional judgment by [the school] in the educational context."  *See Dietz v. Hamden Hall Country Day Sch.*, No. CV 990425791S, 2000 WL 1198010, *3 (Conn. Super. Ct. Jul. 25, 2000) (dismissing NIED claim under *Gupta* of high school plaintiff who, having been a responsible student until April of his senior year, began "frequently skipp[ing] classes and in other ways violat[ing] school rules," where NIED claim was premised on school's failure "to notify Dietz's family of his difficulties in a reasonably prompt manner thereby effectively concealing this information from them"); *Brodsky v. Mead Sch. For Human Dev.*, No. DNX05CV970156788S, 1999 WL 391580, *14 (Conn. Super. Ct. June 4, 1999) (dismissing NIED claim by parents of student known by school administrators to have "special needs" where after attending school for a year and a half, student's behavior "deteriorat[ed]" and school refused to permit student to attend school during or after "additional psychological therapy," because "decisions regarding admission, suspension and expulsion involve the exercise of professional judgment. As such, a claim for negligence arising from these events cannot be maintained.").

32.)  Plaintiff argues that these facts distinguish it from the type of claim foreclosed by *Gupta* because her claim is not "premised on a duty to educate."

Plaintiff's arguments are unavailing.  Most importantly, while her claim is that Porter's personnel were *negligent* in their handling of Plaintiff, including after being informed that she was suffering from distress, the *Gupta* exceptions, which permit claims against educational institutions that "act arbitrarily, capriciously, or in bad faith," *Gupta*, 239 Conn. at 595, necessarily exclude negligence theories of liability.  *See, e.g.*, *id.* at 598 ("Bad faith means more than mere negligence; it involves a dishonest purpose").  In addition, *Gupta* does not foreclose only claimed breaches of duties to educate.  Instead, *Gupta* holds, more broadly, that a school's "academic decision deserves deference from the courts." *Craine*, 259 Conn. at 663–64 (describing holding of *Gupta*).

Under *Gupta*, "[t]he plaintiff bears a heavy burden in proving that [her] dismissal resulted from arbitrary, capricious, or bad faith conduct on the part of the [school].  To prevail, [s]he must show that the [school's] decision had no 'discernable rational basis.'" *Gupta*, 239 Conn. at 596.  Because the Handbook provides that dismissal is warranted upon violation of any Major Rule, and because Plaintiff violated a Major Rule when she consumed alcohol, Porter's's determination to dismiss Plaintiff does not lack a "discernable rational basis."

For these reasons, Defendants are entitled to summary judgment on Count 7.

2.      Count 8: Intentional Infliction of Emotional Distress ("IIED")

In Connecticut the tort of intentional infliction of emotional distress ("IIED") is comprised of four elements:

31

> "It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."

*Appleton v. Board of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (quoting *Petyan v. Ellis*, 200 Conn. 243, 253 (1986)).   Whether an actor's conduct is "extreme and outrageous" is an issue for the Court in the first instance and a factual question for the jury "[o]nly where reasonable minds disagree" as to whether "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* at 210–11.

In addition to arguing that the claim is foreclosed by *Gupta* because it is essentially a challenge to Plaintiff's having been dismissed (*see, e.g.*, Defs.' Reply Mem. at 9), Defendants assert that "there is simply no conduct that could reasonably be considered extreme and outrageous" (Defs.' Mem. Supp. at 34).  Plaintiff counters that her

> IIED claim is based on Windsor's insistence that Tatum leave campus immediately, at night, to serve a three day suspension; failure to process her request for medical leave; blocking the Director of Counseling from viewing or evaluating physician reports and [Dr.] Bass' request that Forner evaluate Tatum; refusing to process and grant medical leave to Tatum and blocking school communications with her doctors; blocking Tatum from communicating with teachers and students while she was still enrolled as a student; summarily expelling Tatum without allowing her to defend herself; refusing to cooperate with Tatum's South Carolina School and frustrating her efforts to continue her efforts to continue her education; and seeking to obtain a release of legal claims as part of the expulsion, knowing that an expulsion would stigmatize Tatum.  All of these actions took place after Tatum had been experiencing major emotional distress from difficulties with other students, and many of these actions took place after Defendants were aware that Tatum's physicians had recommended she be placed on medical leave due to her mental condition.

(Opp'n at 35–36 (citing allegations of the complaint).)

Plaintiff's arguments are unavailing.  As an initial matter, Plaintiff relies on the facts alleged in her unverified complaint rather than those supported by the record, as required by Rule 56 as grounds to deny summary judgment.  In any event, neither the facts alleged nor the facts in the record reflect outrageous conduct or suggest any intent to inflict emotional distress on Tatum.  Windsor's requiring that Tatum immediately leave campus is not only not outrageous, but it is consistent with the Student Handbook, which provides that one possible disciplinary consequence of a violation of a major school rule is "[s]uspension," meaning "[a] specific length of time during which a student is separated from the school and sent home."  It is unclear what Plaintiff means in referring to the failure to process "her request for medical leave," but the record shows that the request or demand was made by Dr. Bass, not Tatum, and that that request or demand was inconsistent with the Student Handbook's medical–leave provisions, which, as described above, contemplate Porter's's discretion to engage in an Porter's–led medical investigation into the propriety of a medical leave.  In addition, Windsor's request that the Basses sign a legal release is also not outrageous or atrocious, especially given the Basses' having retained a series of attorneys in the days before Tatum's expulsion and failed settlement negotiations among the Basses, Porter's, and their respective attorneys.

In addition, case–law reflects that conduct more outrageous than that alleged or shown here does not rise to the level necessary to sustain an IIED claim.  In *Greenhouse v. Yale University*, for example, the district court dismissed a plaintiff's IIED claim for lack of outrageous conduct where she was participating in a play and alleged that a theater faculty member directing the play directed male students to simulate masturbation and orgasm

while standing next to her.  The department chair to whom she complained then "placed her 'on warning' as a preliminary step to dismissal from the Drama School," including for having complained about the simulated–masturbation incident; a faculty member gave her a deadline to withdraw if she wanted some of her tuition payment back; "the Faculty and students subjected her to 'macho' and 'frat house' behavior and disparate treatment"; the Drama School dean kissed her; and the Drama School eventually dismissed the plaintiff even though her work was "obviously superior" to other students' work.  *Greenhouse*, No. 3:05cv1429(AHN), 2006 WL 473724, *1–*4 (D. Conn. Feb. 28, 2006).

In *Dollard v. Board of Education of Town of Orange*, the Connecticut Appellate Court dismissed an IIED claim for lack of extreme and outrageous conduct where the plaintiff, a school psychologist employed by the defendant board of education, alleged that individual defendants, her supervisors, conspired "to force the plaintiff to resign from her position or to become so distraught that they would have a colorable basis for terminating her employment" by "transferring the plaintiff to a school where she did not want to be assigned and then secretly hired someone to replace her at the school from which she had been transferred.  The defendants also publicly admonished the plaintiff for chewing gum, being habitually late, being disorganized and not using her time well. Finally, the defendants unnecessarily placed the plaintiff under the intensive supervision of a friend of [one of the defendants].  The defendants ultimately forced the plaintiff to resign."  *Dollard*, 63 Conn. App. 550, 552–53 (2001).  The Appellate Court held that this conduct "was no more extreme and outrageous than the conduct alleged in *Appleton*," *id.* at 555, in which the Connecticut Supreme Court dismissed an IIED claim premised on allegations by a plaintiff–teacher that the defendants "(1) subjected her to condescending comments in front

of her colleagues, (2) subjected her to two psychiatric examinations, (3) told her daughter that the plaintiff was acting differently and should take a few days off from work, (4) had police escort the plaintiff out of the school, and (5) suspended her employment and ultimately forced her to resign," *id.* at 554–55 (citing *Appleton*, 254 Conn. at 211).

Finally, in *Seiwert v. Spencer–Owen Community School Corp.*, 497 F. Supp. 2d 942, 957 (S.D. Ind. 2007), the district court in Indiana, applying the same IIED standard as applied in Connecticut, granted summary judgment to the defendant on plaintiff's IIED claim for lack of extreme and outrageous conduct.  In that case, the record of "two school years of bullying and Defendants' perceived lack of response to the bullying" of a middle-school student showed that the plaintiff–student told his principal of threats made against him but the principal told him not take them seriously; that the student and his parents again told the principal, and the board of education and school staff and administration, about the bullying; that eventually the plaintiff–parents "became involved in a [public school] effort to address school bullying by developing anti–bullying pledges for parents, faculty and students, and by helping to develop a disciplinary grid to deal with repeated incidents of bullying by students"; that a gym teacher took no action when students began assaulting the plaintiff–student; the assistant principal removed the plaintiff–student rather than discipline the bullies; that the plaintiff–parent removed the plaintiff–student from the school for medical reasons; that the plaintiff–student's sister was warned that when the plaintiff–student returned to school the bullies "were going to kill" him; that the school–bus driver was informed of the death threat; and that the bully eventually assaulted the plaintiff–student on the school bus while the driver simply looked on.  *Id.* at 947–50.  The court held that the facts might show negligence, but did not demonstrate support a

conclusion that the behavior was "atrocious and utterly intolerable in a civilized society." *Id.* at 957.

As in these cases, neither the facts alleged nor the facts shown by the record reflect any conduct by Porter's or Windsor that is outrageous or atrocious. While "there is a limit to the mistreatment [a plaintiff] must endure before having grounds to seek redress in the courts," *Davis v. City of Hartford*, 601 F. Supp. 2d 488, 494 (D. Conn. 2009), the record in this case does not reflect facts from which a jury might reasonably conclude that Porter's's and Plaintiff's conduct was atrocious and outrageous. Therefore, Defendants are entitled to summary judgment on Count 8.

### 3.   Count 9: Breach of Fiduciary Duty

Plaintiff also brings a claimed breach of fiduciary duty against Porter's. The parties dispute whether Porter's owed a fiduciary duty to Plaintiff. "It is well settled that a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 640 (2002). A fiduciary relationship is "characterized by 'a unique degree of trust and confidence such that one party undertook to act primarily for the benefit of the other.'" *Biller Assocs. v. Peterken*, 269 Conn. 716, 725 (2004) (quoting *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.*, 255 Conn. 20, 41 (2000); alterations in *Biller Assocs.* omitted)).

In her Fourth Amended Complaint Plaintiff alleged that "[Porter's] stood *in loco parentis* to [her] and owed [her] a continuing fiduciary duty of protection and care." (4th Am. Compl. at Count Nine at ¶ 66.) As noted above, however, Connecticut's *in loco parentis* statute applies only to public schools, and Plaintiff has not asserted this theory in briefing

at summary judgment.  Instead, she argues that there is a genuine issue of material fact whether Porter's owed Tatum a fiduciary duty.  Although the Connecticut Supreme Court has "refused to define 'a fiduciary relationship in precise detail and in such a manner as to exclude new situations,' choosing instead to leave 'the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other,'" *Alaimo v. Royer*, 188 Conn. 36, 41 (1982); *see also Johnson*, 119 F. Supp. 2d at 98 (noting that "[t]he Connecticut Supreme Court has purposefully refrained from defining 'a fiduciary relationship in precise detail and in such a manner as to exclude new situations.'" (quoting *Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 220 (1994)), the question of whether a fiduciary duty exists is a question of law, *see Biller Assocs.*, 269 Conn. at 721–22 (explaining that "the determination of whether a duty exists between individuals is a question of law. . . . Only if a duty is found to exist does the trier of fact go on to determine whether the defendant has violated that duty"; and holding that because the trial court's determination that "[an attorney's] duty to Biller Associates was that of a fiduciary" was a "conclusion[] of law," its review was "plenary").  The fact that the existence of a fiduciary duty exists turns on the facts of the case does not render the question one of fact rather than law.  The Court's research has not revealed a single case in any state or federal court within the Second Circuit holding or even suggesting that a secondary school—public or private, boarding or day–session—or its employees owe a fiduciary duty to its students.  *See also* 78A C.J.S. Schools § 1107 ("A private school, school officials, and school teachers do not owe a fiduciary duty to a student presenting educational and behavioral problems." (citing *Key v. Coryell*, 86 Ark. App. 334 (2004))).

Plaintiff argues that "the context of the present case" shows there to be a question for the jury as to the existence of a fiduciary duty: "Tatum was a minor child in a boarding school, which was expected to provide care, supervision, and protection at all times, to meet students' physical and emotional needs."  (Pl.'s Opp'n at 39.)  Neither these facts, nor the remainder of the record, demonstrate or suggest that Porter's owed Tatum a fiduciary duty. The facts do not show that "that [Porter's] undertook to act primarily for the benefit of [Tatum]."  *Biller Associates*, 269 Conn. at 725.  To the contrary, the Head of School's Welcome Letter in the Student Handbook sets a tone that suggests that the paramount interest of all members of the Porter's community should be *Porter's*, and *not* the students. Windsor's letter states that "[w]hat makes our community successful is the personal dedication of each individual to fulfilling her own dreams and desires and to *working wholeheartedly for the good of Porter's.*"  Even if Plaintiff could establish a relationship of unique trust or confidence in one or more of the specific adults who supervised her—her dormitory mother, academic advisors, or teachers—these individuals are not defendants, and the record shows Windsor, the only individual defendant, not to have had substantial contact with Plaintiff prior to the incidents at issue in this suit, and therefore not to support any conclusion that the Windsor–Tatum relationship was characterized by such trust or confidence.

Because the record, taken in the light most favorable to Plaintiff, does not show that either of the named Defendants owed any fiduciary duty to Plaintiff, Defendants are entitled to summary judgment on Count 9.

38

D.      Additional Claims

      1.      Count 10: Declaratory Relief

In Count 10, Plaintiff "seek[s] a judgment declaring that the decision to expel Tatum is improper and is void."  (4th Am. Compl. at Count 10 at ¶ 73.)  For the reasons stated above, the Court has concluded the opposite: the summary–judgment record does not show Windsor's or Porter's's decision to expel Tatum to be a breach of contract or any common–law duty or obligation.  That decision is not void.  Therefore, Plaintiff is not entitled to the declaratory relief she seeks, and the Court will grant Defendants summary judgment on Count 10.

      2.      Count 11: Mandatory Injunctive Relief

At oral argument Plaintiff agreed that Count 11, in which she had sought injunctive relief requiring Porter's to award her a diploma, was moot in light of her having graduated from Beaufort Academy and having enrolled and matriculated at Tulane University.  Count 11 is therefore dismissed.

III.     Conclusion

For the reasons stated above, the parties' Motions to Seal [Doc. ## 146, 159] are GRANTED, and Defendants' Motion for Summary Judgment [Doc. # 143] is GRANTED IN PART and DENIED IN PART as follows: the motion is denied as to Count 1, and is otherwise granted.  Plaintiff's Count 1, for breach of contract, remains for trial.


IT IS SO ORDERED.


                                        /s/
                                        Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 1st day of September, 2010.